Case No. 16-5229, Otsuka Pharmaceutical Co., Lt v. Sylvia Matthews Burwell, Secretary, et al. Mr. Saunders for the appellants, Mr. Whitaker for federal appellees, and Mr. Jay for intervener appellees. Good morning. May it please the Court. The FDA improperly treated Alkermes compound and the Otsuka compound that comes in the body to achieve its therapeutic effect is legally equivalent for purposes of approving Alkermes drug, but is distinct for purposes of ignoring Otsuka's exclusivity. Now, legally equivalent is entirely your term. Yes, legally equivalent is our term to describe what happened here because under there are actually different provisions of the statute that are being brought into play, but you're making a sort of all-purpose term, legally equivalent. Well, there are two provisions of an integrated statute that in this respect have parallel structure because a 505b2 application must still meet all the requirements of 505b1. The only difference is you're relying on somebody else's studies. And 505b1, so the application to show the safety and efficacy of Alkermes drug, required studies, quote, made to show whether or not such drug is safe and effective. Yes. And we don't emphasize such drug. Right. And so the structure there is approval of Alkermes application depended on treating the two compounds as legally equivalent. Otherwise, studies made to show that Aripiprazole is safe and effective couldn't meet their requirement of showing that their compound was safe and effective. And so the problem with the FDA's interpretation is they gave a broad meaning and allowed such drug to encompass both at the same time for purposes of approval. But then when you come to take the bidder with the suite and have the parallel exclusivity provision Take the bidder with the suite is your assumption, not built into the statute, right? No, it's the fundamental structure of the statute here is that the follow-on applicant has a choice. And if they choose to rely on the studies of the pioneer applicant, then under the made to show whether or not such drug is safe and effective language, they are essentially saying that we are the same for these purposes. It seems to me you're just defining the statute as accepting your interpretation of it. Well, it's all- I mean, it seems to me when you use this term such drug, conditions of approval of such drug, a perfectly reasonable, at least as a matter of language, reading of that is a drug which has certain core characteristics relating to previously applied, previously invoked drugs. And the FDA has to decide which characteristics are critical. And it decided active moiety was critical. No, because I think there are two things. One is when you look at the conditions of approval of such drug, if you compare that structure to the structure of the patent certification provision, where someone is certifying to patents which claim a use for such drug for which the applicant is seeking approval. You have the same issue here, which is there you have a use for such drug, the pioneer drug, for which the applicant is seeking approval. So either one of two things is true. Either such drug is a term that is not limited as narrowly as the FDA is saying it is for purposes of voiding exclusivity, or for purposes of a structure like that, a use for such drug, the operative language is use, and the prepositional clause is orienting you but isn't limiting. And here we have the same structure in the conditions of approval. It's conditions of approval of such drug in terms of not necessarily equating those two, the of such drug being in the prepositional phrase, or if such drug is operative there, then it can't be interpreted more narrowly than the way that such drug would be interpreted for purposes of patent certification and for purposes of getting approval in the first place. When you say such drug, not for purposes of patent certification. I get the argument that, you know, we did look for consistency across different provisions, but if we focus on the provision that's more directly at issue here, the such drug, which drug are you talking about? The such drug in that refers back to the drug with exclusivity, and based on these parallel provisions and structures of the statute, any equivalents of that drug that are close enough that studies of that would be considered made to show whether the follow-on applicant is approved. The last part of it I don't quite understand. So it seems like you're presupposing that there's some relationship between the two drugs. In other words, it's not an entirely unmoored inquiry into conditions of approval. It's not the case that if one gets approval for a headache drug, then any other drug, no matter how distinct, that has to do with headaches is off limits, that the exclusivity attaches to even as to that, right? So there's some relationship between the drug for which approval has already been obtained and as to which exclusivity attaches and the drug that we're talking about now that's asserted to be out of bounds because it's encompassed by the exclusivity provision. Right. The parallel with the patent provision points you to the broader definition, but we're saying the Court doesn't need to go that far. There is a narrower but still clear and unambiguous interpretation here which arises from the such drug. It says even if you're going to give operative effect to that, then you have to be giving effect to that consistent across all these provisions. And what's the relationship between those two drugs? Because what the agency says is the relationship is active moiety. And if it's not a circumstance of active moiety, then we're not worried about exclusivity at that point because we're talking about something different. And as I understand your position, you, of course, don't agree that it's active moiety. At least you think that. In fact, you think that reading is prohibited by the statute. But you also don't agree that no association between the drugs would still be okay. There's got to be some kind of chemical association. Right, and it's the association that makes them close enough that you can rely on the pioneer to get approval. So any time you rely on the initial drug, the first-in-time drug, whatever relationship there is, your argument is, look, if the relationship is good enough for you to rely on it, then it's also good enough to trigger exclusivity. We have the caveat that if it's good enough for you to rely on it and for the FDA to accept it. In other words, what the FDA can't do is both simultaneously. If you come in and say, I'm relying on this completely unrelated drug, the FDA can look at that and say, I don't see how the studies of the first drug are made to show that your drug is okay. So we could reject it as the application, but once those two are close enough. Right, so if it rejects it, then you're wrong. Exactly, but once those two are close enough, then they have been legal. This is our idea of legal equivalence under the structure of the statute. And then at that point, those two would be treated the same, And then what do you do with the recognition that you can rely on, you don't have to rely on a drug at all, you can rely on scientific literature. You could also rely on, I thought this was an interesting example brought up on the other side, I think it might have been by the intervener, but you can rely on an inactive ingredient. So you have something, it makes all the sense in the world to rely on an inactive ingredient, because you would say, look, there's been a bunch of stuff that shows that the inactive ingredient doesn't pose any safety issue. So we're fine as far as that goes, so don't worry about that. It doesn't have anything to do with the helpful qualities of the thing for which we're seeking to get approval. It's just that you don't have to worry about the inactive part. Right, so for the inactive ingredient, I think that it's going to be pretty rare that someone's going to go down the 505B2 path and open themselves up to exclusivity for an inactive ingredient, as opposed to treating that. There's a line that's drawn in terms of when you are relying on previous studies between reliance on something that's in the literature, an approved application that's tied to a particular clinical trial, as opposed to just background principles in the literature.  So I think people are going to avoid exclusivities on inactive ingredients by citing the background principles. Now, to the extent that something is subject to exclusivity, in the sense that someone did a clinical study, that clinical study was essential to the approval of the drug, and the key condition of approval of that, what you're adding that's new is the new inactive ingredient. Then at that point, if someone is relying on that as part of their drug, then I think you could say that they are equating the two, even though it is the inactive ingredient. I just think it's a far-fetched hypothetical in reality, because people will easily find ways around this not to do it as a 505B2. But if they think the only way I can do this, the only way I can take this shortcut, is by citing the pioneer and their clinical approval, and that's the way we're going to do it, then they would be equating the two and would have to accept the exclusivity. Now that question, of course, is not before this court, because here we have a very tight connection in the sense that we have a... Right, but we're just trying to understand the implications of your position, and I guess the implications of your position is that any time, even though Congress clearly wanted to create a regime under which reliance was promoted in order to streamline the approval process, your position is when you say take the bitter with the sweet, that means that whenever you rely, you're subject to exclusivity, period. Even if you're relying on it only for purposes of dealing with an inactive ingredient, still exclusivity kicks in, and you've got to figure out a way to do it without relying. Right. If you've met the stringent requirements to have gotten exclusivity, which means it has to be essential for approval, so if there was background literature that predated the pioneer's application that related to that inactive ingredient, then it's going to be very difficult for the pioneer to have any exclusivity that is actually covering that inactive ingredient. But yes, once they do this, and because I think the congressional purpose was to balance these two provisions in the sense that they wanted streamlining, they wanted people to be able to rely on what came before, but under certain circumstances, and those circumstances mean respecting the exclusivity for the conditions of approval or change, and in the scheme of things, these are very short exclusivity periods for three years here, or work out an agreement, as often happens, where you get a right to refer to the first-in-time applicant. In other words, what you've done is you've created a rule that says, as the default, if you're going to do this, you'll have to respect their exclusivity, but created a ready mechanism by which the parties can bargain around. Well, is the period that short? Because as I understand it, it's three years, but then what we're talking about here is, I'm going to get the pronunciation wrong, is it Arepiprazole? Arepiprazole, yes. Okay, Arepiprazole. So we're talking about Arepiprazole, which for that in particular was already a five years, and then we've tacked on a different three years because we're talking about a supplement. No, you haven't tacked on a different three years. You've been given a separate and far narrower exclusivity period for three years. In other words, Alkermes was entirely free to make a tablet of Arepiprazole, as the ten generic tablets on the market currently do. It was entirely free to make its own tablet. It was entirely free to do a long-lasting injectable for some other indication of use. What happened here is it relied on Arepiprazole, and it took the shortcut to the exact destination where ATSUCA had exclusivity, which was for the long-lasting injectable, and for the latest exclusivity period is for acutely relapsing patients. Right, but we don't know that yet, that part of it. I mean, that's your argument as to the scope of the exclusivity. I guess that hasn't been. The agency never got to that because the agency got off the train on active moiety. That's correct. The agency decided this. Either the district court or opposing counsel made the argument, your view gives broader scope to the three-year exclusivity than to the five-year exclusivity, which they suggest is anomalous, and I didn't see an answer to that. Oh, no, yeah, not at all. In the one respect of active moiety, there's an argument because, number one, we get into tricky issues of whether the scope for five-year exclusivity is limited to the same active moiety. There's a tension between the regulations and statute, but even setting that aside. Are you asking us to take active moiety out of the five-year exclusivity? No, no, because there are other grounds by which the scope is narrowed. Number one, you're talking about three years rather than five years. I understand, but that's the point. And number two, you're talking about five-year exclusivity attaches to the chemical for all of its uses. So it's very broad. It gives you almost more like patent protection, in the sense that if someone comes in and says, your drug for ADHD we now want to use for cancer, you still get to block them. Three-year exclusivity, because it's just the conditions of approval and the change, is far narrower and more targeted. And in particular, in this world, it gives you a lot less protection against off-label use, in the sense that if you have, unlike if you've just kept the molecule out, if you've gotten your particular exclusivity for a condition of approval, they're not going to be able to label their drug for that. They're not going to be able to promote for that. But if they can come in for some other indication, doctors will have flexibility. So the three-year exclusivity is still a far cry from the value of the five-year exclusivity, even without the identical activity requirement in it. And because the three years is focusing on that new and marginal innovation, what have you added, what is the change that you have made, and it's not focusing on what has remained the same? Any questions? Thank you. May it please the Court. Henry Whitaker for the FDA. The FDA reasonably concluded that the conditions of approval of a drug do not encompass the conditions of approval of a different drug with a different active moiety. And I take it that it is common ground in this case, as Judge van der Waassen pointed out, that to determine the conditions of approval of a drug requires some kind of comparison between the two drugs. And the FDA's way of making that comparison is indeed reasonable and in accordance with longstanding agency policy. And I would stress, in particular, this Court's decision in activist, which addressed this question in a somewhat different context, but I think goes a long way towards saying that the FDA reasonably resolved the question for the Court. I mean, in activist, the question was whether one drug that is a prodrug of another, of an already approved molecule, could be considered to be a new chemical entity entitled to five-year exclusivity. And the FDA said it was because it had a different active moiety than the already approved drug, even though, as it happened, the new chemical entity metabolized into the drug. And that... So it seems like that case, of course, gets you a long way with respect to prodrug, or at least that's your position, it gets you a long way with respect to prodrugs and the permissibility of using active moiety, at least in that context. But I take it that Atuka's position is, that's all fine and dandy, but what we're talking about here is a reliance. And once you rely on a study with respect to a particular drug, well, you're relying on that drug to show that your drug's okay. If you rely on that, you're subject to the exclusivity for that drug on which you rely. If you don't want to deal with exclusivity, then don't rely on it. And what's the agency's response to that? Well, exclusivity, Your Honor, in contrast to the general nature of the B2 pathway, does not depend on reliance. And I think that's because when a drug is submitted under the B2 pathway, reliance, in the sense in which that's appropriate, is a different sense than whether two drugs are the same. And the reason for that is because, look, as I think Your Honor pointed out, you can rely on a drug in obtaining approval that may be a significantly different drug, and the intervener site's the example of the inactive ingredient example that we've discussed already. But there are others. I mean, J.A. 7374, it's an agency document that talks about a number of different examples where the relied-upon drug may be significantly different. I mean, for example, the U.S. Army got approval of a drug to treat nerve gas poisoning, I guess, on the basis of animal trials for efficacy. So the nature of the B2 pathway is quite different, I think, from exclusivity. And, look, I mean, Atsuka, I take it, is hanging their hat on this argument from statutory structure. But when you examine the statutory structure, I think it becomes clear that Congress is using the term drug in a variety of different senses. I mean, in the B2 pathway, at the front end of the statute, the drug that is being referred to is the applied-for drug. And here that would be Aristide. That is the drug that is being referred to. Fast-forwarding to one subparagraph later in the patent certification provisions, Congress reverts to referring to a relied-upon drug, which in this case would be Abilify tablets. In the patent notice provision, the drug being referred to is, once again, the applied-for drug, here Aristide. And then fast-forwarding to exclusivity, the drug that is being mentioned when talking about such drug is the drug product of the drug that received exclusivity. So this is a term that is highly context-sensitive, and the idea that you could say that this is the only – that Atsuka's reading is the only reasonable way to read the statute, I think, is inconsistent with how Congress employed those terms in a variety of different senses. And, actually, I think the comparison with the patent certification provision only underscores that reliance is not the touchstone of exclusivity, unlike patent certification, because there really is, in that provision, an explicit focus on what drug was relied upon, in contrast to exclusivity, in which the only mention of reliance in that provision – there actually is a mention of reliance, but it is only in defining the kinds of applications that exclusivity applies to, namely B2 applications. So the structural reading of the statute in context and in structure only underscores that we've acted reasonably. Okay. Here. Trying to understand this always gives me something of an excedrin headache. Me too, Your Honor. I need you to go back, speak a little slower, and let me see if I can figure out what's happening here, okay? So, as I understand this, what Zuka is talking about is the definition of conditions of approval. That is to say, if the drug that you're relying on, active ingredient or not, was essential to the approval, I'm assuming Arkema, is that the way it's pronounced? Alchemy. Alchemy. Okay. So if that was essential to the approval of their drug, then you're implicating the conditions of approval of Atsuka's drug, and thus their exclusivity comes into play. Is that correct? I don't think that's quite their argument, Your Honor. The investigations that were essential to the approval of the drug product that was granted exclusivity here, Abilify Maintena, and its supplement to Abilify Maintena, those were the relevant investigations that established Atsuka's exclusivity at issue here. What Atsuka objects to were the investigations that Alchemy has relied on in securing approval of Aristata, this new chemical entity under the B2 pathway. And in securing approval of Aristata, Alchemy has relied on not Abilify Maintena, which is the drug in this case that was granted exclusivity. Instead, Alchemy has relied on these old findings with regard to Abilify Tablets, which was created. And Abilify Tablets was a drug that was approved in 2002. Its exclusivity expired. It was entitled to exclusivity. It expired in 2007. So I understand. But the pioneer drug, though, the active ingredient, is the same in both. Is that right? No, that's not right, Your Honor. That's not right. Okay. So the drug that was approved is Aristata. The active moiety, there's no dispute in this case. No, I thought Judge Brown was asking about the two drugs being the tablet and then Maintena. Those two drugs have the same active ingredient, active moiety, which is aripiprazole. And that differs in—well, that has a significant chemical structural difference from the drug that was approved here, Aristata. And as it turns out, Aristata actually— Okay, so just so I understand. So if those are different, then how could they rely on the studies for the pioneer drug in seeking approval? Certainly, Your Honor. You can rely on studies concerning a different drug. It doesn't necessarily mean the two drugs are the same if they have similar characteristics. And the touchstone for knowing whether that reliance is appropriate is you have to show that it is scientifically appropriate to rely on the different drug. And Judge Chernivosten talked about the example of if you have a drug, a different drug with a different active ingredient, but has the same inactive ingredient as a previous drug, and you can rely on the fact that that previous drug's inactive ingredient was demonstrated to be safe and effective. In other words—I'm sorry, go ahead. No, well, I'm just trying to follow this. So here, though, we have two drugs whose active ingredient is the same or not. Well, it depends on which two drugs you're talking about, Your Honor. Well, I understand the prodrug. So is there a difference between active ingredient and effective ingredient? Because it seemed to me that what they were saying was this one metabolizes to the same ingredient as the pioneer drug. Yes, Your Honor, but that doesn't mean the two drugs are equivalent. I mean, one example outside of this context is Allegra and Seldane, okay? So Seldane is a prodrug of Allegra, okay, in that Seldane metabolizes into whatever Allegra is. But Seldane is off the market and Allegra is not because, as it happens, Seldane causes heart problems, whereas Allegra does not, even though they are prodrugs. So it is often the case that prodrugs, even though one metabolizes into another, have significant differences. And there's some evidence in this case that bears that out. After all, Aristata is effective for up to 50 percent longer than Abilify-Maysenna, and that's quite significant when you consider that one of the main purposes of having a long-lasting injectable for the treatment of schizophrenia, which is what Maysenna does and what Aristata does, is precisely because schizophrenia patients are not necessarily the best at taking their medicine. Well, and our prior decision seemed to accept the proposition that even though one drug may be a prodrug of the other one, they can still be considered different drugs for purposes of new drug approval. That's exactly right, Your Honor, and that's precisely because when one drug has a different active moiety than another drug, that in general means that it has a significantly different pharmacological effect. And that was certainly – this Court did uphold that judgment and acted this in the Court. We think that goes a long way towards – And just to pick up on the questions that Judge Brown was asking, can I ask you this? So from the agency's perspective, is this a fair or unfair characterization? When the B-2 applicant relies on a study concerning something that's already been approved, is the way the agency views that reliance something along the following lines? Even though that's a different drug by hypothesis, it's still relevant to the approval of this drug because there's enough of a relationship that the safety and efficacy that was approved with respect to that one is germane to this one. That's a different drug, but it's still relevant. I think that's exactly right, Your Honor. And it's important to stress as well that it's not as if this leaves the original innovator without any protection. I mean, the patent certification provisions do require certification if they're relevant patents. And Natsuka certainly could have sued alchemies for patent infringement. It was duly given a notice that there were certain patents that might have been infringed by Abilify, and it didn't take that option. So there certainly is robust intellectual property protection here. Again, just so I understand, is it true, as counsel said, that the FDA is interpreting this phrase, such a drug, differently in different provisions of the statute? We're not interpreting it inconsistently. I think we're interpreting them differently because they do mean different things depending on the statute. I mean, again, for example, the term such drug in defining the B-2 pathway is just talking about the applied for drug, which is Aristata in this case. And such, I mean, the term such refers back to some drug that's originally mentioned. Just because Aristata relied on a different drug doesn't mean that the term such drug is referring to a simultaneous reference to two different drugs. And again, so I think that what we're saying is that, I mean, the term drug is context sensitive. It doesn't necessarily mean the same thing everywhere it appears in the statute. I think the term drug means the same thing everywhere. It's just which drug you're talking about might be different depending. Well, right, although there is, sometimes drug refers to drug product. Sometimes drug refers to drug substance. I mean, there's various gradations even within just looking at the term drug. So it's a highly context sensitive term, and the idea that you could invalidate us as unreasonable based on that kind of structural inference seems to me not to hold water. Okay, I'm just. Oh, no, please, please. I'm trying to understand this. Because you've said that they did have to give notice under the patent certification provision, right? So does that mean that FDA can approve a drug that would nevertheless be subject to an infringement action? Your approval has nothing to do with that. Yes, that's right, Your Honor. The statute takes patent law as it finds it, more or less. There is a stay of approval if they do bring a patent infringement suit in certain circumstances. But, yes, whether it would infringe as a matter of patent law is a different matter. And I think that's one of the reasons why it is reasonable to interpret the patent certification provision a little bit differently because, I mean, that's really a prophylactic measure that's designed to capture any time a use for which an applicant is seeking approval might or might not meet with a potentially infringing patent. And so just one more question. If FDA actually read these provisions in harmony, that is to say the way Otsuka would like to read them, would that protect from the patent infringement problem or would that make no difference? Well, I think if you accepted Otsuka's reading, we think our reading is quite harmonious. Well, I mean, I think it would give Otsuka a type of intellectual property protection under exclusivity that Congress never contemplated, or at least the agency reasonably concluded that Congress did not contemplate. Again, Otsuka, one of the anomalous things about Otsuka's position in this case is that they are claiming that Abilify tablet, effectively Abilify tablets exclusivity, which expired in 2007, can be sort of indefinitely extended by making subsequent more modest modifications to the drug. There's no question in this case, one of the oddities of this case, is there's no question that Alchemies didn't rely on the new clinical investigations that Otsuka conducted to secure approval of maintenance. It only relied on these very old studies, well, findings regarding a relatively old drug whose operation has been well known for some time. And I think that's exactly the kind of thing that Congress contemplated in creating the B2 pathway, was that companies wouldn't have to reconduct clinical trials with regard to drugs whose effects are relatively well known. No. I think I understand your argument. They are arguing for a certain symmetry or reciprocity, and you are saying the agency doesn't read the statute that way. We do not read the statute to turn on the lies. No, Your Honor. It's not as if this is always going to be sort of anti-exclusivity. I mean, we rely on the Veloxus case. I mean, there's sometimes where you can gain reliance to try to narrow the scope of exclusivity. So sometimes a drug applicant may try to rely on an old study to avoid exclusivity, when in reality it's trying to copy a newer drug, and we rejected that in Veloxus. So reliance kind of works in both ways. I don't think that we've in any way read the statute to be, you know, not harmonious. I think that this is just a reasonable way of looking at the statute, that reliance is something quite different and does not necessarily relate to the scope of exclusivity. And certainly there's nothing in the language of the exclusivity provision that would suggest that reliance is somehow the touchstone. Okay. Thank you. Thank you. May it please the Court. I'm William Jay for the Alkermes Parties. Each approval of a new drug adds to the storehouse of knowledge on which others may rely in developing their own innovations. Now a patent or exclusivity can give you the right to your own innovation, but it doesn't prevent others from building on the storehouse of existing knowledge to develop their own. This really is a good case to illustrate why it's important that innovators be allowed to rely on the storehouse of existing knowledge, because the purpose of the B-2 pathway, as Congress said in its committee report at page 16, and as the FDA has reiterated and as I think this Court has recognized, is that B-2 studies are not supposed to redo work that's unnecessary, to rediscover what's already been discovered unnecessarily. And, you know, this is a schizophrenia drug. To do a clinical trial of what Alkermes relied on from the 2002 aripiprazole approval would require taking patients suffering from schizophrenia, taking them off their medications, and doing a clinical trial where some of them get placebo. In other words, would not get treatment in order to measure the efficacy of the aripiprazole molecule, which is already known. That's exactly why Congress adopted the B-2 pathway. And so for an innovation like Aristata, which builds on but is not the same as aripiprazole, it does not make sense to instruct Alkermes to go and redo that study and follow the B-1 pathway for innovator drugs when the B-2 pathway was created for a situation just like this. So just so I understand, it seemed like to the layperson that B-1 would be attractive because you get longer and perhaps broader exclusivity. But is that, I mean, from what you're describing, perhaps, you know, that's not a good deal. But if, I guess my question is, since you, the argument is that you have created something new, would you have been able to do that? B-1 doesn't get longer exclusivity than B-2. The longest exclusivity is from Romanet-2. It's the new chemical entity exclusivity. When you develop a new chemical entity that has not been previously approved in any other drug, that's the most significant innovation, and so that's why you get five years of exclusivity. And so I'm asking, have you done that? In other words, you're arguing that it's a new drug. Yes, Aristata is a new drug. It contains an active moiety that's never been previously approved, and that's why we are a new chemical entity entitled to that five-year exclusivity. You are entitled to the five-year exclusivity, but did you get that? Yes. Did you go under that provision? We have the five-year exclusivity, meaning that if someone else came in and said, I would like to make aripiprazole lauroxil, they can't do that during the five-year period, for which aripiprazole lauroxil is the active ingredient. The active moiety has a longer name, which I will try and pronounce. N-hydroxymethyl aripiprazole is the active moiety. If they wanted to make a drug with that in it, they would be blocked by our five-year exclusivity. It doesn't matter whether you go under the B-1 pathway or the B-2 pathway. If your active moiety is new, you are entitled to that five-year exclusivity. So the way you are spitting out your argument, it made it sound like, not about your five-year exclusivity but about the scope of the three-year exclusivity for matina, which is what's given rise to this dispute. It made it sound like you were saying that if the agency had read the statute in the way that Atsuka suggests the statute should be read, in other words, that exclusivity extends beyond the same active moiety but is a related drug and is somehow related to the fact that you've relied on the study. I don't know how the agency would do it, but let's just suppose the agency comes up with a test. It makes it sound like you're saying that that would be forbidden by the statute. So I think that there are two-step answers. Number one, I think there has to be some limiting principle beyond reliance. And I think your colloquy with my friend in his opening argument has brought this out, that it can't just be if reliance, then blocked. And it can't just be the same conditions, then blocked. There has to be, as I think Mr. Saunders said, it has to be, in some sense, close enough. And the statute requires the conditions of approval to be of such drugs. So the question is, what's the same drug? What is close enough, to adopt my friend's phrase? The agency, I think, has reasonably decided that active moiety, which is broader than some conceptions of what an active ingredient might be, because it captures other things like salts and esters, which the agency has concluded are not chemically significant. So the answer to your question is, we're not arguing that the agency's active moiety reading is itself compelled by the statute. We are because it could have gone narrower, for example. But we are saying that they have drawn it right on. But it could have gone broader? Could they have gone broader? It would still have to be, in some sense, the same drug. And I think that the agency is on very solid ground, concluding based on its experience of physiology, medicine, and chemistry, that when there is a non-ester covalent bond that separates one drug from the other, you just can't say that those are the same thing, because in the body they tend to act differently. And that is exactly the point this Court made in its activist decision, quoting at length the FDA's determination that even minor covalent structural changes can have major effects. But it deferred to the agency's interpretation. I guess all I'm asking is, if the agency had a different interpretation, where it says, for example, all produgs are the same drug, then activists wouldn't tell you much because it deferred to an interpretation that went the opposite way. But it sounded like you were saying the agency couldn't even do that consistent with the statute, and it wasn't clear to me why the agency couldn't do that. It didn't, obviously. No, no. My answer is, as long as it is rendering a reasonable interpretation of what it means to be the same drug, I don't think that it could just equate. Take the active ingredient, colloquy that Your Honor had with my friend, for example, to say that the example that we give in footnote 10 of our brief is called bloxifers, which is a drug that essentially wakes up your muscles after surgery and anesthesia. And it relied on two active ingredients from two prior approvals, neither of which was that kind of drug at all. One of them was a muscle relaxant. The other was an anti-nausea medicine. So to say that the anti-nausea medicine and the new medicine that wakes up your muscles were the same drug, I don't think you could do that. I hope that answers your question. But the active moiety test is a bright line that the agency has drawn, not just because it makes scientific sense, but because it's important to have a bright line for the purposes of this statutory exclusivity. You don't have to have such a bright line for the patent certification provision. You can just have reliance be the touchstone, because all that happens when you have to certify the patents is you go and you look at the patents listed in the Orange Book, and you see whether there are patents claiming that substance, and you certify. But if, for example, the patent claims only the molecule aripiprazole and my client's product doesn't use the molecule aripiprazole, it doesn't infringe. And so in those circumstances, the brand doesn't sue. But if the brand does sue within 45 days, it gets an automatic 30-month stay on the FDA's approval, and this goes back, Judge Brown, to your question. The patent certification provision is baked into the approval process in that way, that it stops the approval for 30 months while the parties litigate whether the patent does, in fact, block the new drug. And a patent can be written more broadly than an active moiety. A patent could be written to cover, for example, a whole class of active ingredients. It could be written to cover a formulation that includes inactive ingredients as well. And it can be written to cover a method of use. So the pioneers are free to write their patents how they wish, as long as they can get them from the patent office subject to the requirements of novelty and non-obviousness, and then the parties can hash that out through the Paragraph 4 certification process. But exclusivity needs a bright line. The agency has reasonably concluded that if it's the same drug, then it's blocked. That includes things like salts and esters. But if it's not the same drug in that sense, and Aristata is not, because of its different chemical structure, then it's not blocked. And to remove it from the market would be depriving patients of, as Mr. Whitaker mentioned at the end of his presentation, of the only drug on the market that has the six-week dose. And the different chemical structure, as the FDA acknowledges in footnote 80 of its decision, page 440 of the Joint Appendix, the different chemical structure may well be exactly what is the reason for that longer-acting time period. If the Court has no further questions, thank you, Your Honor. Thank you. All right. You may have two minutes of rebuttal time. We've heard a lot of discussion of the bright line in the Act of Modio Affirmative, but I think if we look at the text of the statute here, you'll understand how the FDA itself has not honored that bright line for purposes of approval. In a 355B2, the hallmark of a 355B2 application is an application submitted under Paragraph 1, under B1, for a drug for which the investigation is described in Clause A of such paragraph and relied upon by the applicant for approval of the application were not conducted by or for the applicant. So the relative investigations in B1 are the ones you're relying on for the B2 pathway. But a B2 drug must still meet the requirements of B1. And the critical language there, and these investigations we're talking about under B1, they only get you to approval if there are full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective. So the problem with saying we have the bright line rule, we have the Act of Modio Affirmative, that's the clarity here, is that for purposes of approval, studies made to show whether or not aripiprazole was safe and effective for use were used to meet the requirement of the studies made to show whether or not alchemy's compound was effective for use. And so the fundamental problem here is in blurring those lines for purposes of approval, but then suddenly springing back and saying there's this bright line for purposes of exclusivity. And we're not asking for something that extends the tablets. We're asking for their view wouldn't honor exclusivity even if there was some exclusivity on the tablets. It's because they're trying to take the shortcut to our later innovation where we have exclusivity. Okay. Thank you. Case will be submitted.
judges: Brown, Srinivasan, Williams